02-12-001-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00001-CV

 

 


 
 
 In the Interest of A.V., 
 A Child
 
 
  
 
 
  
 
 
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 


 

----------

FROM THE 325th
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

          The
sole issue raised in this appeal from a judgment terminating Mother’s parental
rights to her daughter A.V. is whether the evidence is factually sufficient to
show that termination was in A.V.’s best interest.  We will affirm.

II.  Factual
and Procedural Background

          A.V.
was born September 3, 2006, while Mother was in jail.  Mother requested that
A.V. be placed with her grandmother, Mary.[2]  On
December 21, 2007, Mary was appointed as the nonparent sole managing
conservator of A.V. in a suit that did not involve CPS.  After Mother’s release
from jail, Elizabeth Pratt, a CPS investigator, testified that she was assigned
to investigate A.V.’s case because Mother had made a referral, stating that she
believed that A.V. was at risk because Mary was using methamphetamine and was not
allowing Mother access to A.V.

          Pratt
interviewed Mother on November 17, 2010.  Mother reported that Mary was using
methamphetamine and that she had heard that Mary had been seen at Wal-Mart
selling drugs and acting erratically.  Mother admitted to Pratt that she had
been a drug user since she was a teenager, that she had been charged several
times with prostitution and possession of cocaine, that she had used methamphetamine
with Mary both before and after Mother was incarcerated, that she had used drugs
up until two weeks before she met with Pratt, and that she had seen Mary sell
drugs and had observed her making large bank deposits with money from drug
sales.  Mother
told Pratt that she had placed A.V. with Mary because she felt that Mary’s drug
use would allow her more contact with A.V.

          On
November 18, 2010, Pratt met with Mary at her house and discussed the allegations
of drug use.  Pratt asked Mary to take a drug test, and she tested
positive for methamphetamine.  Mary thereafter agreed to place A.V. with the
child’s paternal great-grandmother.  Mary signed an agreement that she would
not have unsupervised contact with A.V., but Mary violated the agreement.

Pratt
said that she assessed whether A.V. could be placed with Mother and decided
that Mother was not a good option because she had admitted using drugs during
the month and did not have a stable living environment.[3]
 Mother and her partner both signed acknowledgement of substance use forms,
stating that they had used methamphetamine and marijuana on November 3, 2010.  CPS
thereafter placed A.V. in foster care.

Julie
Weldon, a CPS caseworker, was assigned to A.V.’s case in May 2011.[4]  Weldon testified
that Mother had completed the CATS outpatient drug treatment facility program
on February 21, 2011.  Mother had been successfully discharged from individual
therapy at Positive Influences on April 12, 2011, and had participated in
random drug testing with no positive drug tests.  Weldon testified that at the
time she was assigned to the case, Mother was maintaining a safe and
appropriate home environment for A.V., and Mother was maintaining contact with
the CPS caseworker.  Weldon testified that because Mother was doing everything
that CPS asked of her,[5] CPS’s plan as of May 2011
was a monitored return of A.V. to Mother.

So in
June 2011, after Mother took and passed a drug test, CPS allowed Mother
unsupervised visits overnight with A.V. from June 9 through 12, June 20 through
22, June 27 through 29, and July 1 through 5.  During the unsupervised visits,
there was to be no contact with Mary so that Mother could bond with A.V. and also
because Mary had continued to use methamphetamine.[6]

Following
the four successful unsupervised visits, CPS’s plan was for A.V. to stay with
Mother beginning July 11 through the July 14 court date because CPS believed
that the trial court would grant a monitored return.  On July 11, Weldon picked
up A.V., along with all of her belongings, from her foster parents’ home.  A.V.
was “a little hesitant” but was happy to be going to Mother’s home.  When
Weldon arrived at Mother’s home, she knocked on the door several times, as well
as on the windows, but there was no answer.  Weldon called and texted Mother
and her partner but received no response.  Weldon finally reached Mother for a
few seconds, but then the phone disconnected, and Weldon was unable to get in
touch with Mother after that.  Weldon ultimately took A.V. back to her foster
home; A.V. acted out after the monitored return fell through.

Weldon
testified at the termination trial on December 1, 2011, that Mother had been
missing since July 11, 2011.  Mother had left Weldon a message on October 20,[7]
but Weldon had been unable to reach Mother on October 25 and never heard from
Mother again.  Weldon did not know where Mother was living.

Weldon
testified that Mother could not meet the present or future educational, emotional,
or medical needs of A.V.  Weldon also did not believe that Mother could provide
a safe environment, food, clothing, or shelter for A.V. at the time of the
termination trial or in the future.

Weldon
therefore asked the trial court to terminate Mother’s parental rights to A.V.
because termination of Mother’s parental rights to A.V. was in A.V.’s best
interest.  The Department also asked that Mary be removed as managing
conservator and that the Department be named as managing conservator with the
authority to place A.V. for adoption.  The Department planned for A.V. to be
adopted by a family other than her foster family.[8] 

          After
hearing the testimony, the trial court found by clear and convincing evidence
that grounds for termination had been proper and that termination of the
parent-child relationship between Mother and A.V. was in A.V.’s best interest.  This
appeal followed.

III.  Factually
Sufficient Evidence Exists to Support Best Interest Finding

          In
her sole issue, Mother argues that the evidence is factually insufficient to
support the best interest finding because there was evidence that she had made
so much progress during the case.

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our
own.  In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine
whether, on the entire record, a factfinder could reasonably form a firm
conviction or belief that the termination of the parent-child relationship
would be in the best interest of the child.  Tex. Fam. Code Ann. § 161.001
(West Supp. 2011); In re C.H., 89 S.W.3d 17, 28 (Tex. 2002).

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).

Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical
needs of the child now and in the future;

(C)     the emotional and physical
danger to the child now and in the future;

(D)     the parental abilities of the
individuals seeking custody; 

(E)     the programs available to
assist these individuals to promote the best interest of the child;

(F)     the plans for the child by
these individuals or by the agency seeking custody;

(G)     the stability of the home or
proposed placement;

(H)     the acts or omissions of the
parent which may indicate that the existing parent-child relationship is not a
proper one; and

(I)      any excuse for the acts or
omissions of the parent.

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).[9]  These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each factor will not support such a finding.  Id.

          Here,
the forty-seven-page reporter’s record does not reveal five-year-old A.V.’s
preferences.  There was some evidence that A.V. was “a little hesitant” but was
happy to be going to Mother’s home when Weldon attempted to drop her off on
July 11.  The record did not demonstrate whether A.V. felt differently at the
time of the termination trial after not having seen Mother for almost five
months.  The trial court was entitled to find that this factor weighed slightly
in favor of termination.

          The
record also does not set forth the specific present and future emotional and
physical needs of A.V., other than that she takes medication for ADHD.  The
record does, however, contain Weldon’s testimony that Mother could not meet the
educational, emotional, or medical needs of A.V. at the time of the termination
trial or in the future and that Mother could not provide a safe environment,
food, clothing, or shelter for A.V. at trial or in the future because Mother’s
whereabouts were unknown at trial.  The trial court was entitled to find that
this factor weighed in favor of termination.

          The
main emotional and physical danger to A.V. at trial and in the future was
abandonment by Mother.  During Mother’s visits, A.V. was confused, prompting
the exclusion of Mary from Mother’s unsupervised visits to allow Mother to bond
with A.V.  Moreover, A.V. acted out when the monitored return fell through
after multiple unsupervised home visits.  Another physical danger supported by the
record was Mother’s placement of A.V. with a known drug user—Mary—raising a
question of whether Mother would properly protect A.V.  The trial court was
entitled to find that this factor weighed in favor of termination.

          With
regard to Mother’s parental abilities, the record reveals a rollercoaster
pattern.  Mother initially placed A.V. with a known drug user because Mother
gave birth to A.V. while in jail.  Mother’s CPS history included a previous CPS
case involving physical and medical neglect.  Mother’s criminal history
included convictions for prostitution and possession of cocaine.  Mother then
found a partner who would provide stable housing, attempted to clean up her act
by working services, and bonded with A.V. through visits, including
unsupervised visits.  However, because Mother failed to secure employment and
was dependent upon her partner for housing and all of life’s necessities, Mother’s
ability to provide for A.V. vanished when the relationship with her partner allegedly
ended near the time of the attempted monitored return.  Moreover, Mother’s unexplained
disappearance through the time of trial raised questions regarding her
parenting abilities.  The trial court was entitled to find that this factor
weighed in favor of termination.

          The
record lacks any information regarding the programs available to assist Mother
in promoting A.V.’s best interest.

          Because
Mother had not been located at trial, her plans for A.V. were unknown.  The
Department’s plan for A.V. was adoption by the respite family who had cared for
her while she was away from her foster home.  The trial court was entitled to
find that this factor weighed in favor of termination.

          Although
Mother had previously shown the ability to provide a stable home, Mother’s
residence and whereabouts were unknown at the time of the termination trial. 
The record did not contain information regarding the stability of the prospective
adoptive family’s home.

          In
addition to Mother’s prior drug use and her decision to place A.V. with Mary, the
main act or omission of Mother that may have indicated to the trial court that
the existing parent-child relationship was not a proper one was Mother’s unexplained
disappearance.  By failing to show up on July 11 to accept A.V. for the
monitored return, by failing thereafter to return Weldon’s calls for three
months, and by failing to keep the Department apprised of her whereabouts,
Mother missed out on the opportunity to be reunited with A.V.  The Department
attempted to give Mother what she now requests, but Mother disappeared, and her
whereabouts remain unknown.  The trial court was entitled to find that this
factor weighed in favor of termination.

          Giving
due deference to the factfinder’s findings, without supplanting the
judgment with our own, and after reviewing the entire record, we hold
that a factfinder could reasonably form a firm conviction or belief that
termination of the parent-child relationship between Mother and A.V. is in A.V.’s
best interest.  See In re M.N.G., 147 S.W.3d 521, 539–40 (Tex. App.—Fort
Worth 2004, pet. denied) (holding evidence factually sufficient to support best
interest finding because Mother lacked fundamental parenting skills and refused
to obtain and maintain stable housing and employment).  We overrule Mother’s
sole issue.

IV.  Conclusion

          Having
overruled Mother’s sole issue, we affirm the trial court’s judgment terminating
Mother’s parental rights to A.V.

 

 

PER CURIAM

 

PANEL: 
WALKER, DAUPHINOT, and GARDNER, JJ.

 

DELIVERED: 
June 7, 2012









[1]See Tex. R. App. P. 47.4.





[2]An alias is used to ensure
anonymity.  See generally Tex. R. App. P. 9.8.





[3]Pratt also testified that
Mother had a previous CPS case involving physical and medical neglect; the name
of the child involved was not given.





[4]A caseworker named Tamesha
Sowell was assigned to the case after Pratt and before Weldon, but Sowell was
no longer with CPS at the time of the termination trial and did not testify.





[5]But Weldon later testified
that she had asked Mother to seek employment, to attend Narcotics Anonymous
meetings on a regular basis, and to get an education through the adult literacy
programs in the area and that Mother did not follow through on these requests.





[6]The rule of no contact
with Mary was violated on one occasion when Mother accidentally ran into Mary
in public.





[7]In the October 20 message,
Mother mentioned Weldon, gave her name and phone number, and asked Weldon to
call her back. 





[8]A.V.’s foster family had
placed A.V. with a respite family for a week while another foster child had
brain surgery; the respite family “fell in love” with A.V. and inquired about
adopting her.





[9]Because neither Mother nor
the Department analyzes the section 263.307(b) factors but instead focus only
on the Holley factors in their briefs, we will analyze the evidence
pertaining to the best interest finding under the Holley factors as
well.